<u>**FOR PUBLICATION**</u>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Order Filed on September 29, 2025
by Clerk,
U.S. Bankruptcy Court
District of New Jersey**

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | CHAPTER 13 |
| Youngjae Sun, | : | |
| | : | CASE NO.: 24-20581-SLM |
| Debtor. | : | |
| | : | |

<u>**OPINION**</u>

**APPEARANCES:**

Law Office of Jae Y. Kim
Jae Y. Kim, Esq.
1630 Center Avenue
Fort Lee, NJ 07024
*Attorney for Youngjae Sun*

Ryu & Ryu, PLC
Michael Hyunkweon Ryu, Esq.
163-07 Depot Road
Suite 208
Flushing, NY 11358

301 Maple Avenue West
Suite 620
Vienna, VA 22180
*Attorney for Creditor, Sharron Kim*

**STACEY L. MEISEL, UNITED STATES BANKRUPTCY JUDGE**

## INTRODUCTION

This case centers on an issue undecided by the Third Circuit.  It involves the competing interests between a Chapter 13 debtor's voluntary right to dismiss under 11 USC § 1307(c), and a creditor's motion to convert a Chapter 13 case to one under Chapter 7 for bad faith under 11 USC § 1307(b).  The Court must determine whether a Chapter 13 debtor has an absolute right to dismiss his case despite a pending motion to convert the case to Chapter 7 for bad faith.  In other words, does the right to voluntarily dismiss prevail over a creditor's right to convert for bad faith?  And if an absolute right exists, does the Court still have to examine the creditor's allegations of bad faith?

The plain language of the statute, the guidance of the Supreme Court, the Sixth and Ninth Circuits and other bankruptcy courts make the answer clear.  A Chapter 13 Debtor possesses an absolute right to dismiss his bankruptcy case—no matter what.  Simply, an absolute right to dismiss exists even if the debtor acts in bad faith.  However, this does not mean that a debtor gets a free pass to abuse the bankruptcy process.  A bad faith debtor must bear the consequences of his actions.  An appropriate remedy is to bar a bad faith debtor from filing bankruptcy for a certain period.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984, and amended September 18, 2012, referring all bankruptcy cases to the Bankruptcy Court.  Jurisdiction also exists under 28 U.S.C. §1334(b) because this matter arises

in Title 11. This matter constitutes a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A) as it concerns the administration of the estate. Venue is proper under 28 U.S.C. §1408.

## BACKGROUND AND PROCEDURAL HISTORY

Youngjae Sun (the "**Debtor**") is the former owner of a sushi restaurant called Sushi Café. ECF No. 27, ¶ 9. From around December of 2005 to August 5, 2022, Sharron Kim ("**Creditor Kim**")[1] worked at Sushi Café. ECF No. 20-3, ¶18. On August 25, 2022, Creditor Kim commenced a Fair Labor and Standards Act action in the District Court of New Jersey captioned *Kim v. Sushi Café, Inc., et al.,* Index No. 22-cv-5234 (D.N.J.) (the "**District Court Case**"). ECF Nos. 20-4, 20-1, ¶ 2. The District Court Case also names the Debtor as a defendant. *Id.*

### The Debtor's Petition, Schedules, And Chapter 13 Plan

On October 25, 2024, four days prior to a scheduled settlement conference and pretrial hearing in the District Court Case, the Debtor filed a voluntary petition for relief (the "**Petition**") under Chapter 13 of Title 11 of the United States Code (the "**Bankruptcy Code**"). ECF No. 1. On the Petition, the Debtor states that he lives at an address in Wayne, New Jersey and affirms that he does not rent his residence. *Id.* at 2 and 3. On the Petition, the Debtor fails to check the box to indicate whether his debts are primarily business debts. *Id.* at 7.

On *Schedule A/B: Property* ("**Schedule A/B**"), Debtor lists no cash and no deposits of money, including checking or savings accounts. *Id.* at 12. On Schedule A/B, Debtor also lists no legal or equitable interest in any business-related property and no interests in partnerships or joint ventures. *Id.* at 16. On *Schedule D: Creditors Who Have Claims Secured by Property*, Debtor lists no secured creditors. *Id.* at 21. On *Schedule E/F: Creditors Who Have Unsecured Claims* ("**Schedule E/F**"), Debtor lists four unsecured creditors with claims totaling $26,037.56. *Id.* at

---

[1] The Court notes that there are three individuals in this case that share the last name Kim: (1) the creditor, Sharron Kim; (2) the attorney-turned-witness, Ryan Kim; and (3) the paralegal who testified in the Evidentiary Hearing, Catherine Kim.

22-25.    The Debtor's unsecured creditors include Creditor Kim for the District Court Case ("**Creditor Kim's Claim**") and the U.S. Small Business Association (the "**SBA**") for a business loan granted to Sushi Café (the "**SBA Loan**").  ECF No. 1 at 23-24; Case No. 24-20581, Claim 1-1, Part 2.  The Petition lists the amount of both Creditor Kim's Claim and the SBA Loan as "unknown."  ECF No. 1 at 23-24.  On Schedule E/F, the Debtor states that he owes $0.00 in taxes and certain other debts to the government.  *Id*. at 25.

On *Schedule I: Income* ("**Schedule I**"), the Debtor lists his monthly income as $650.00 from his work as a line cook at J&J Sushi.  *Id*. at 28.  On Schedule I, the Debtor lists his wife's monthly income as $3,683.33 from her work as a manager at Kame Sushi Inc.  *Id*.  The Debtor fails to provide a street address for J&J Sushi LLC and fails to provide any address for Kame Sushi Inc.  *Id*.  On *Schedule J: Expenses* ("**Schedule J**"), the Debtor lists his rental or home ownership expenses as $0.00.  *Id*. at 30.  On Schedule J, the Debtor states he does not expect an increase or decrease in his expenses within a year after filing the Petition.  *Id*. at 32.

On Debtor's *Statement of Financial Affairs for Individuals Filing for Bankruptcy* (the "**SOFA**"), the Debtor states that he received income from operating a business during the 2022 and 2023 calendar years.  *Id*. at 37.  For the 2022 calendar year, the Debtor lists $48,501.00 from wages, commissions, bonuses, and tips, and $2,330.00 from operating a business.  *Id*.  For the 2023 calendar year, the Debtor lists $32,650.00 from wages, commissions, bonuses, and tips, and $13,613.00 from operating a business.  *Id*.  Debtor fails to provide whether he received any income from employment or operating a business during the 2024 calendar year.  *Id*.  On the SOFA, the Debtor states that he gave no gifts worth over $600 to any one person within two years of filing the Petition.  *Id*. at 40.  On the SOFA, the Debtor also states that he did not sell, trade, or otherwise transfer any property to anyone within two years of filing the Petition, except in the ordinary course

of business or financial affairs. *Id*. at 42. On the SOFA, the Debtor lists his businesses as Sushi

Café, Inc. and JS Global, Inc. *Id*. at 46. The Debtor characterizes Sushi Café, Inc. as a restaurant

and JS Global, Inc. as a delivery service. *Id.* The Debtor fails to provide an address for either

business on the SOFA. *See Id.* The Debtor signed the Petition and Schedules under penalty of

perjury. ECF No. 1 at 7, 35, 47, and 53.

The Debtor filed his *Chapter 13 Plan and Motions* (the "**Chapter 13 Plan**") on the same

day he filed the Petition. ECF No. 3. On October 28, 2024, the Clerk of the Bankruptcy Court

scheduled the hearing on confirmation of the Chapter 13 Plan for January 8, 2025 (the

"**Confirmation Hearing**"). ECF No. 6. On December 5, 2024, the Chapter 13 Trustee (the

"**Trustee**") filed *Trustee's Objection to Confirmation of Plan*, stating that Debtor failed to provide

the Trustee with the required documentation ahead of the 341(a) meeting of creditors (the "**341(a)**

**Meeting**") (the "**Trustee Objection**"). *See* ECF No. 11. Later that day, the Debtor filed an

amended Schedule I, wherein he discloses Kame Sushi's address and indicates that his wife has

been employed there for two years. ECF No. 12. Notably, the address of Kame Sushi matches

the address where Sushi Café previously operated. *Compare* ECF No. 12 *with* ECF No. 31-1. On

December 6, 2024, the Clerk's Office entered a *Notice of Failure to File Supplemental Documents

Concerning Schedules*, noting that Debtor corrected Schedules I/J, but was still missing other

documents. ECF No. 13. Later that day, the Debtor filed a *Summary of Your Assets and Liabilities

and Certain Statistical Information* (the "**Summary Form**") and a *Declaration About an

Individual Debtor's Schedules*. ECF No. 14. The Summary Form contained identical information

to the Schedules. *Compare* ECF No. 1 *with* ECF No. 14.

On January 2, 2025, Creditor Kim filed *Objection to Confirmation of Chapter 13 Plan (*the

"**Kim Objection**"). ECF No. 20. The Kim Objection contends that at the 341(a) Meeting, the

Debtor testified that he had a $2,500 monthly rent obligation to his wife's family for his residence. ECF No. 20-2, ¶ 7.  Creditor Kim notes that at the 341(a) Meeting, the Debtor testified that his wife was the owner of Kame Sushi, although Schedule I only lists her as a manager.  ECF No. 20-2, ¶ 8.  Creditor Kim alleges that Kame Sushi's website states that it was formerly Sushi Café and lists the same address and phone number of Sushi Café.  ECF No. 21-4, ¶ 3.   The Kim Objection also attaches the transcript of Debtor's deposition in the District Court Case, wherein the Debtor admits his wife opened Kame Sushi at Sushi Café's prior location.  ECF No. 20-4.  The Debtor also testified that he "got rid of" Sushi Café's financial records.  *Id.*

**The Motion to Convert**

On January 8, 2024, hours before the Confirmation Hearing, Creditor Kim filed *Creditor's Motion to Convert Debtor's Case to Chapter 7* (the "**Motion to Convert**").  ECF No. 21.  Creditor Kim asserts that conversion is more appropriate than dismissal.  *Id.*  Creditor Kim argues: (1) the Debtor's actions and filings reveal bad faith; (2) the Debtor's *Chapter 13 Plan* is unconfirmable; (3) the Debtor's unsecured debts exceed Section 109(e)'s debt limits; and (4) conversion is in the creditors' best interests.  *Id.*

**The Confirmation Hearing**

At the Confirmation Hearing, the Trustee added additional objections.  The Trustee argued that Debtor's unsecured claims totaling $1,400,000.00 exceeded the Section 109(e) debt limit.  The Trustee summarized the four claims filed in this case.  The Trustee asserted that Creditor Kim's claim is the largest, totaling $1,085,411.35, comprised of $1,070,261.35 as an unsecured portion and $15,150.00 as a priority claim.  *See* Proof of Claim No. 4-2.  The Trustee then indicated that the Debtor consented to dismissal, but Creditor Kim requested the case be converted.  The Court declined to consider the Motion to Convert at the Confirmation Hearing, noting that Creditor Kim filed it earlier that day.  Ultimately, the Trustee asserted that dismissal of the case would be best.

Although the Debtor consented to dismissal, he disputed that his debts exceeded the Section 109(e) debt limits and refused to consent on that basis.  The Debtor asserted that there was never a final judgment in the District Court Case.  The Debtor argued that because Creditor Kim's Claim is listed as contested, contingent, and unliquidated, it does not count towards the Section 109(e) debt limit.  In response, the Court asked the Debtor if he was instead seeking a voluntary dismissal under Section 1307(b) since he did not consent to all parameters of dismissal.  On the record, the Debtor verbally confirmed the same (the "**Motion to Dismiss**").  The Court asked Creditor Kim why a Debtor does not have a right to voluntarily dismiss a case under Section 1307(b).  Creditor Kim relied on *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007) for the proposition that a Chapter 13 debtor does not have an absolute right to dismiss under Section 1307(b).

The Court discussed notice regarding the Motion to Dismiss and explained that parties were on notice of dismissal.  The Trustee Objection sought dismissal at confirmation, albeit for other reasons, whereas the Debtor sought it voluntarily under the statute.  Therefore, the only thing that changed was the characteristic of the dismissal.  The Court remedied any concerns regarding notice by adjourning the Confirmation Hearing to January 30, 2025, and allowing the parties to submit supplemental briefing.  The Court instructed the parties to submit simultaneous briefing addressing the issue of whether the Court should dismiss the Debtor's case pursuant to 11 U.S.C. §1307(b).

**The Debtor and Creditor Kim's Supplemental Briefing**

The Debtor filed a *Certification of Debtor in Support of Application to Dismiss Chapter 13 Case and In Opposition to Motion to Convert Case to Chapter 7* (the **"Debtor's Dismissal Certification"**) and a *Memorandum of Law in Support of his Application to Dismiss Chapter 13 Case in Opposition to Motion to Convert Case to Chapter 7* (the **"Debtor's Dismissal Memo"**).

ECF Nos. 27 and 28, respectively. The Debtor asserts: (1) he filed his Petition because he could not afford the litigation costs associated with the District Court Case and to address the SBA Loan; (2) he cooperated throughout his case by providing all requested documents to the Trustee and by making all plan payments; and (3) the plain language of Section 1307 makes clear that there is an unqualified right for a debtor to dismiss his chapter 13 case absent a prior conversion. ECF No. 27, ¶ 7- ¶ 8, ECF No. 28.

In *Creditor Sharron Kim's Brief in Support of Motion to Convert debtor's Chapter 13 Case to Chapter 7* ("**Kim's Supplemental Brief**"), Creditor Kim argues: (1) the Debtor exceeds the Section 109(e) debt limit; (2) the Court should convert the case because Sections 1307(b) and (c) are not independent of each other but are interdependent; and (3) Section 1307(b) does not provide the Debtor with an absolute right to dismiss. ECF No. 29. Creditor Kim requests the Court impose a meaningful sanction rather than a 180-day refiling bar if the Court dismisses the Debtor's case. *Id.* However, Creditor Kim does not further brief the issue of the bar on filing. *Id.*

On January 24, 2025, Creditor Kim filed *Creditor Sharron Kim's Reply to Debtor's Opposition brief to Creditor's Motion to Convert Debtor's Chapter 13 Case to Chapter 7* ("**Kim's Reply Brief**"). ECF No. 31. Creditor Kim asserts that: (1) Congress never intended to allow a Chapter 13 Debtor to control his case; (2) the Debtor lists the SBA Loan on his schedules to create an illusion because Sushi Café, rather than the Debtor, is solely liable for that loan; and (3) the Debtor's ineligibility to be a Chapter 13 Debtor stems from the Debtor's SBA Loan, which the Trustee identifies as exceeding $350,000. *Id.*

The Debtor did not file any further briefing.

**<u>The Evidentiary Hearings</u>**

The Court held an evidentiary hearing to determine if the Debtor acted in bad faith in filing his Petition (the "**Evidentiary Hearing**"). The Court conducted the Evidentiary Hearing on March

3, 2025, March 19, 2025, and April 28, 2025 (collectively, the "**Hearings**"), with the Court holding a mid-trial conference on April 17, 2025.   During the Evidentiary Hearing, Creditor Kim's attorney, Michael Ryu ("**Mr. Ryu**") presented three witnesses: (1) Catherine Kim, Mr. Ryu's paralegal; (2) Ryan Kim, Creditor Kim's Counsel in the District Court Case[2]; and (3) the Debtor as an adverse witness.   The Debtor called no witnesses.

Catherine Kim's testimony offered nothing of import to the finding of bad faith.   Catherine Kim's testimony served only to show that she personally mailed subpoenas for the Bankruptcy Rule 2004 examinations to the Debtor.   Evid. Hrg. Tr. 12:14–16:6, March 3, 2025.   Ryan Kim was called twice: once as a fact witness and once as an impeachment and rebuttal witness.   The first time Ryan Kim was called on March 3, 2025, he offered testimony that he visited Sushi Café, which is now Kame Sushi, and that the businesses shared the same telephone number and address. *Id*. at 24:15–25:20.   Ryan Kim testified that he visited Kame Sushi's website, and it appeared to him that Kame Sushi was presenting itself as Sushi Café's successor.  *Id*. at 27:7–13.   Ryan Kim further testified that he attended the 341(a) Meeting where the Debtor testified that he pays $2,500 in monthly rent to his mother or sister-in-law.  *Id*. at 30:17–31:11.   Ryan Kim testified that he did not see rent payments listed on the Debtor's bankruptcy documents.  *Id*. at 31:11–14.

On March 3, 2025, Creditor Kim called the Debtor as an adverse witness.  *Id*. at 33:20–24. After being sworn in, the Debtor asked the Court for a translator.  *Id*. at 34:3–8.   The Debtor explained that English was not his first language, and he wanted to be able to fully understand the questions.  *Id*. at 36:19–37:5.   Although the Debtor failed to request a translator at the outset of the Evidentiary Hearing, the Court carried the Evidentiary Hearing to March 19, 2025, to accommodate the Debtor's request and so that the Debtor could obtain those services.

---

[2] Ryan Kim was previously co-counsel in this case. With the Court's reminder of the Rules of Professional Conduct, he withdrew as counsel at the Evidentiary Hearing on March 3, 2025, to act as a witness in the case.

On the continued date of March 19, 2025, Mr. Ryu's direct examination of the Debtor detailed the Debtor's longstanding residency in the United States.  The Debtor admitted he began attending school in the United States in the seventh grade and took general studies courses in college that included English.  Evid. Hrg. Tr. 14:4–16:12, March 19, 2025.  The Debtor testified he could not remember if he signed his Petition or if there was an actual signed copy of his Petition. *Id*. at 70:13–71:8.  The Debtor admitted he listed a zero-dollar monthly income on his *Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period*.  *Id*. at 71:20–72:2.  The Debtor then admitted that from November to December of 2024, he worked part-time at a sushi restaurant called J&J Sushi.  *Id*. at 75:5–76:1.  The Debtor also admitted that he occasionally worked at Kame Sushi to help his wife when the business first opened in October or November of 2024.  *Id*. at 76:7–14.

The Debtor further testified that he closed Sushi Café in August of 2022.  *Id*. at 80:5–9.  When Sushi Café closed, the Debtor disposed of the equipment that was no longer operational and left some of the equipment at the location, which is now used by his wife's restaurant, Kame Sushi.  *Id*. at 89:9–90:9.  The Debtor admitted that Kame Sushi uses the same telephone number that Sushi Café used but the Debtor was unsure whether the telephone account was formally transferred to Kame Sushi.  *Id*. at 78:13–25.  The Debtor testified he could not recall if he closed Sushi Café's bank account in 2022.  *Id*. at 81:10–13.  The Debtor admitted that before closing all of Sushi Café's business accounts, the Debtor transferred approximately $100,000 out of Sushi Café's bank account.  *Id*. at 82:4–10.  Debtor used the transferred funds to invest in Fresh Grab and Go, another sushi business the Debtor started prior to Sushi Café's closing.  *Id*. at 82:11–22.  The investment in Fresh Grab and Go was used to buy fish, sushi containers, pay the salaries of three employees, tolls and gas for deliveries, insurance, taxes, and other business expenses.  *Id*. at 86:11–87:9.

The Debtor further testified that Fresh Grab and Go was incorporated as JS Global, Inc.
*Id*. at 85:11–19.  The Debtor testified that from October to November of 2022, he operated the
Fresh Grab and Go business at the Sushi Café location.  *Id*. at 86:9–13.  The Debtor testified he
operated Fresh Grab and Go for five months, spending the $100,000 investment as the business
continued to lose money, which resulted in the Debtor accruing tens of thousands of dollars in
debt.  *Id*. at 87:10–21.  The Debtor testified that he owed money to his older brother, mother, and
mother-in-law, but admitted that those debts were not listed as creditors because everyone had
since forgiven his debts.  *Id*. at 87:22–89:8.  In November of 2022, after approximately one month
of operations, the Debtor sold Fresh Grab and Go to an individual—a wholesaler named Will
Park—for only $1,000.  *Id*. at 83:4–15.  The Debtor testified that a certified public accountant
named Max did his personal tax return most recently when he was working for J&J Sushi in
November and December of 2024.  *Id*. at 93:18–24.  The Debtor then admitted he did not file
personal tax returns for 2023 or 2024.  *Id*. at 93:25–94:3.  The Debtor could not recall if he filed
his 2022 tax return or if he and his wife filed their taxes jointly for the relevant years.  *Id*. at 94:4–
10.

On the continued date of April 28, 2025, the Debtor testified that Sushi Café and JS Global,
Inc. were the only two companies he had owned.  Evid. Hrg. Tr. 15:1–9, April 28, 2025.  The
Debtor testified he did not operate either company in 2023.  *Id*. at 4:19–23.  Mr. Ryu produced
the Debtor's SOFA wherein the Debtor listed his 2023 income from "operating a business" as
$13,613.00.  *Id*. at 5:6–11; ECF No. 1 at 37.  In response to questioning regarding the SOFA, the
Debtor admitted that he did not know how he calculated his 2023 income.  Evid. Hrg. Tr. at 8:11–
21, April 28, 2025.  Mr. Ryu then produced a *New Jersey Division of Revenue Certified Copy of
Certificate of Amendment to the Certificate of Incorporation* for a corporation called JS Global

Enterprise Inc. (the "**Certificate of Incorporation**").  *Id*. at 16:7–12.  Upon reviewing the

Certificate of Incorporation, the Debtor testified "[s]o the prior question you asked me, if I operated

any other business other than Sushi Café or JS Global Inc., this is the same company as JS Inc., JS

Global Inc." *Id*. at 17:11–13.  The Debtor admitted the two names were different.  *Id*. at 17:14–

18.  The Debtor admitted that the Certificate of Incorporation listed him as the registered agent

and listed the same address as the location of Kame Sushi and Sushi Café.  *Id*. at 17:19–25.  Mr.

Ryu noted that on the Certificate of Incorporation, the registered agent was amended from the

Debtor to his brother, Youngjun Sun, and the officers and directors were amended from the Debtor

to the Debtor's wife and brother.  *Id*. at 18:1–19; 21:23–22:12; 24:2–5.  The Debtor responded that

he did not understand the document.  *Id*. at 24:6–8.

When asked why he filed bankruptcy, the Debtor testified he filed because he lacked money

for litigation costs in the District Court Case.  *Id*. at 25:12–16.  The Debtor testified that he chose

Chapter 13 over Chapter 7 because he wanted to pay his creditors to the best of his ability.  *Id*. at

25:23–26:6.  When asked why he selected "no" to having primarily consumer debts on his SOFA,

the Debtor could not explain what "consumer debt" was, why he checked the box, or what the

question was asking.  *Id*. at 26:7–23.  Despite Debtor testifying he earned $650 monthly in 2024,

he listed no 2024 income on his SOFA, claiming he only began working to make Chapter 13 plan

payments.  *Id*. at 26:24–28:10.

The Debtor testified he made SBA loan payments until June 2024, borrowing cash from

family members including his parents, brother, and in-laws.  *Id*. at 28:25–29:3; 30:8–16.  The

Debtor claimed he did not disclose these loans in his bankruptcy schedules because he did not

know he had to.  *Id*. at 30:12–31:20.  The Debtor testified that neither he nor his wife pay rent for

the house where they currently live.  *Id*. at 31:21–23.  Mr. Ryu introduced audio of the 341(a)

Meeting wherein the Debtor answered "yes" when asked if he or his wife paid rent. *Id.* at 35:12–18. The Debtor admitted that he answered "yes" at the 341(a) Meeting. *Id.* Mr. Ryu introduced a screenshot of a Yelp account, posting under the name "Youngjae S" with the Debtor's photograph, responding to Kame Sushi reviews. *Id.* at 38:23–39:24. The Debtor denied making the post, suggesting it might have been his wife. *Id.* at 39:14–19.

On cross-examination from his own counsel, the Debtor confirmed that he worked at J&J Sushi for less than a month before filing bankruptcy and acknowledged his 2022- and 2023-income figures could have been from tax returns. *Id.* at 46:4–47:13. On redirect, when shown evidence he had not filed his 2023 tax return, Debtor admitted he did not remember going to an accountant. *Id.* at 49:7–14.

Once the parties concluded their examinations of the Debtor, the Court conducted its own examination of the Debtor. The Debtor could not recall whether any payments were made on the SBA Loan after the Chapter 13 case commenced, but noted that he generally made those payments online. *Id.* at 51:13–52:10. The Debtor believed that the last payment was made in October or November of 2024. *Id.* at 52:3–7. The Debtor could not remember which account he used to make payments on the SBA Loan. *Id.* at 52:11–14. In fact, the Debtor could not recall whether he had a personal bank account at the time of filing. *Id.* at 52:15–18. The Court asked the Debtor when he last had a personal bank account. *Id.* at 53:12. The Debtor admitted he has a personal account at M&T Bank, which he opened in October 2024 when he closed the J&J business.[3] *Id.* at 53:12–23. The Court pointed the Debtor to his Schedule A/B and asked if the Debtor saw the M&T Bank account listed. *Id.* at 53:24–25. The Debtor admitted he did not see anything listed. *Id.* at 54:1.

---

[3] Notably, the Debtor testified "I opened that account as *I* was closing J&J business." Evid. Hrg. Tr. 53:15, April 28, 2025 (emphasis added). The Debtor did not previously disclose any managerial or ownership interest in the J&J Sushi company. Up to this point, the Debtor only indicated he was a line cook at J&J Sushi.

The Debtor further testified that he made his roughly $400 Chapter 13 monthly plan payments from the M&T Bank account. *Id*. at 54:2–10.

When the Court concluded its examination of the Debtor, Ryan Kim was recalled to testify as an impeachment and rebuttal witness. *Id*. at 54:20–25. Ryan Kim offered testimony regarding two screen captures he took on his phone on March 3, 2025 at 11:26 a.m. *Id*. at 57:1–4. The screen captures were of a Yelp review page for Kame Sushi that contained reviews left by customers of Kame Sushi. *Id*. at 57:1–23. The screen captures also included responses from a profile with the name "Youngjae S." with the Debtor's photo and the title "Business Owner." *Id*. at 59:1–13. Ryan Kim testified that, at the March 3, 2025 Evidentiary Hearing, he showed the screenshots to others in the courtroom after the Judge left the bench, pointing out that someone with the Debtor's picture was holding himself out as the owner of Kame Sushi. *Id*. at 58:2–10. Ryan Kim testified that Debtor was present in the courtroom within earshot. *Id*. at 58:16. The screenshots showed at least two customer reviews with responses from a profile identified as "Youngjae S" bearing the Debtor's photograph and a "Business Owner" designation. *Id*. at 59:1–13. When Ryan Kim checked Yelp again at 1:29 p.m. during lunch, the relevant responses had been removed. *Id*. at 60:8–19. Ryan Kim acknowledged he did not know who controlled the profile or deleted the responses. *Id*. at 69:12–70:10.

Throughout the Debtor's testimony, the Court took note of the Debtor's interactions with the translator and the Debtor's testimony regarding his Petition. Specifically, the Debtor would begin to respond to Mr. Ryu's questions before the translator translated the questions into Korean. It appears that the Debtor fully grasped the English language.

## DISCUSSION[4]

### A. THE DEBTOR HAS AN ABSOLUTE RIGHT TO VOLUNTARY DISMISSAL UNDER SECTION 1307(b)

At the Confirmation Hearing, the Debtor requested a voluntary dismissal under Section 1307(b).  In response, Creditor Kim argued that Section 1307(b) does not entitle a debtor to dismiss their case when faced with a creditor's motion to convert the case for bad faith.  The Debtor's Dismissal Memo states an absolute right to dismiss his case exists under Section 1307(b)'s plain language. ECF No. 28.  And, even if he does not have an absolute right to dismiss his case, his conduct does not warrant conversion.  *Id.*  Creditor Kim argues that Section 1307(b) is ambiguous, and the Debtor's bad faith conduct warrants conversion under Section 1307(c).  ECF No. 29. Pursuant to Section 1307(b), a Chapter 13 debtor has a right to dismiss his case:

> On request of the debtor at any time, if the case has not been converted under section 706, 1112, or 1208 of this title, the court *shall* dismiss a case under this chapter. Any waiver of the right to dismiss under this section is unenforceable.

11 U.S.C. § 1307(b) (emphasis added).  The justification for permitting a Chapter 13 debtor to voluntarily dismiss his case is rooted in both constitutional and policy grounds.  *In re Greenberg*, 200 B.R. 763, 767 (Bankr. S.D.N.Y. 1996); *see also* H.R. Rep. No. 595, 95th Cong., 1st Sess. 120 (1977).  Congress intended for Chapter 13 of the Bankruptcy Code "to be [a] purely voluntary chapter." *In re Harper-Elder*, 184 B.R. 403, 408 (Bankr. D.D.C. 1995).  In fact, Section 303 of the Bankruptcy Code precludes the possibility of an involuntary Chapter 13 case.  *See* 11 U.S.C. § 303 ("An involuntary case may be commenced *only* under chapter 7 or 11 of this title") (emphasis added).

---

[4] At the Confirmation Hearing, the Trustee argued that the Debtor's unsecured claims exceeded the Section 109(e) debt limit. Creditor Kim adopted that argument at times, but ultimately appeared to abandon it. However, Creditor Kim's Claim does not count towards the unsecured debt limit. Creditor Kim's Claim stems from the District Court Case, which is a live case and controversy. Thus, the amount and validity of Creditor Kim's Claim is undetermined and unliquidated. Further, the SBA Loan is to Sushi Café. Debtor is merely a guarantor. Currently, the debt is contingent and unliquidated. Unliquidated debt does not count towards the debt limit per 11 U.S.C. § 109(e). Therefore, the Debtor is eligible under Section 109(e).

The obligations for a Chapter 7 debtor compared to a Chapter 13 debtor are instructive. Unlike Chapter 13, Chapter 7 does not compel a debtor to allocate post-petition earnings for a plan to repay creditors. *See* 11 U.S.C. § 1325. A voluntary debtor should not be compelled to work for his creditors. *In re Greenberg*, 200 B.R. at 767. Forcing a debtor to remain in Chapter 13 could raise challenges rooted in involuntary servitude. *Id.*

1.  **The Evolution of the Case Law Demonstrates that there is an Absolute Right to Voluntary Dismiss Under Section 1307(b)**

Although bankruptcy courts agree that debtors cannot be forced to remain in Chapter 13, they are divided as to whether Section 1307(b) entitles a debtor to an "absolute right" to dismiss. *See In re Marinari*, 569 B.R. 809, 819 (E.D. Pa. 2019) (collecting cases). The Supreme Court has never decided this issue. While the Third Circuit was presented with the issue twice, the Third Circuit ultimately decided both matters without resolving whether the right to dismiss is absolute.[5]

The evolution of case law following the Supreme Court's decisions in both *Marrama v. Citizens Bank of Massachusetts* and *Law v. Siegel*, guides this Court's analysis regarding Section 1307(b). *See Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 366 (2007); *Law v. Siegel*, 571 U.S. 415, 426 (2014).

Prior to *Marrama*, many courts found Chapter 13 debtors had an absolute right to voluntary dismissal. After *Marrama*, courts found the right to voluntary dismissal was predicated upon a finding of no bad faith. A few years later, the Supreme Court in *Law v. Siegel* narrowed the holding in *Marrama*. After *Law*, it appears that no circuit court has expressly held that a Chapter 13 debtor's right to voluntary dismissal is not absolute. *See In re Nichols*, 10 F.4th 956, 963 (9th Cir. 2021) (overruling its earlier decision and holding that Section 1307(b) confers an absolute right to

---

[5] *See In re Ross*, 858 F.3d 779, 784 (3d Cir. 2017) (holding that even if debtor had absolute right to voluntarily dismiss, the bankruptcy court could issue a filing injunction when entering its dismissal order); *see also In re Marinari*, 838 Fed. Appx. 709, 711 n. 2 (3d Cir. 2021) (holding that the bankruptcy court did not err when it dismissed the Chapter 13 debtor's case but acknowledging that the Third Circuit has not resolved the question of whether Section 1307(b) grants an absolute right to dismissal).

dismiss); *see also In re Smith*, 999 F.3d 452, (6th Cir. 2021) (holding that vacating the voluntary dismissal of Chapter 13 debtor's case would violate the mandatory language of Section 1307(b)); *but see In re Chuan Min Chang*, Case No. NC-20-1274-BSG, 2021 WL 2283915 at *1 (9th Cir. BAP June 3, 2021) (finding no abuse of discretion where the bankruptcy court granted conversion over dismissal without discussing Section 1307(b)).

      i.   <u>Pre-*Marrama*</u>

Prior to *Marrama*, courts were split on whether a Chapter 13 debtor's right to voluntary dismissal was absolute.  Some courts held that Section 1307(b) gave debtors an absolute right to voluntarily dismiss a Chapter 13 case.  *See e.g., In re Harper-Elder*, 184 B.R. at 405 (finding that Section 1307(b) is mandatory, and that "such conclusion is in harmony with the design of the statute as a whole and … its object and policy" (*citing Crandon v. United States*, 494 U.S. 152, 158 (1990) (internal citations omitted)); *In re Greenberg*, at 768 (holding that the voluntary nature of Chapter 13 and the plain language of Section 1307(b) required the court to dismiss a Chapter 13 case upon a debtor's motion); *In re Barbieri v. RAJ Acquisition Corp.*, 199 F.3d 616, 619-20 (2d Cir. 1999) (finding the right to voluntarily dismiss is absolute, noting the term "shall" is generally understood as a mandate, especially due to the contrasting use of the permissive "may" in Section 1307(c)); *In re Dulaney*, 285 B.R. 10, 14 (D. Colo. 2002) (stating that Section 1307(b)'s language "unequivocally and unconditionally demonstrates that a debtor has an absolute right to dismissal").

Other courts alternatively found that a Chapter 13 debtor's right to dismiss was not absolute under Section 1307(b).  *See e.g., In re Molitor*, 76 F.3d 218, 220-21 (8th Cir. 1996) (Chapter 13 debtor did not have absolute right to voluntarily dismiss where his multiple filings were "delay tactics" that demonstrated a clear abuse of the legal process); *In re Fonke*, 310 B.R. 809, 814

(Bankr. S.D. Tex. 2004) (holding that the right to dismiss was not absolute because Section

1307(b) required a debtor to *request* dismissal).

    ii.    *Marrama v. Citizens Bank of Mass.*

In *Marrama*, the Supreme Court examined whether a debtor has an absolute right to convert

his case from a Chapter 7 to a Chapter 13 after allegations of bad faith.  *Marrama*, 549 U.S. at 365.

In *Marrama*, a Chapter 7 debtor moved under Section 706(a) to convert his case to a Chapter 13.

*Id.* at 368-70.  The debtor sought conversion to protect assets he concealed prior to filing his

petition.  *Id.*  Section 706(a) states:

> [t]he debtor may convert a case under this chapter to a case under
> chapter 11, 12, or 13 of this title at any time, if the case has not been
> converted under section 1112, 1208, or 1307 of this title. Any waiver
> of the right to convert a case under this subsection is unenforceable.

11 U.S.C. § 706(a).  The Chapter 7 trustee objected to conversion.  *Marrama*, 549 U.S. at 365.

The debtor argued that he had an "absolute right" to convert his case from a Chapter 7 to a Chapter

13.  *Id.* at 370.  The trustee argued that the debtor made the motion to convert in bad faith, and

granting the motion would encourage abuse of the bankruptcy process.  *Id.* at 365.  The Supreme

Court found the debtor was ineligible to be a Chapter 13 debtor because his bad faith filing would

constitute "cause" under Section 1307(c) to dismiss or convert his case.  *Id.* at 373-74.  The

Supreme Court relied on Section 706(d) and Section 1307(c) of the Bankruptcy Code in reaching

its decision.  *Marrama*, 549 U.S. at 373-74.  Section 706(d) of the Bankruptcy Code provides:

> Notwithstanding any other provision of this section, a case may not
> be converted to a case under another chapter of this title unless the
> debtor may be a debtor under such chapter.

11 U.S.C. § 706(d).  Section 1307(c) of the Bankruptcy Code provides, in part:

> Except as provided in subsection (f) of this section, on request of a
> party in interest or the United States trustee and after notice and a
> hearing, the court may convert a case under this chapter to a case
> under chapter 7 of this title, or may dismiss a case under this chapter,

> whichever is in the best interest of creditors and the estate, for cause
> . . . .

11 U.S.C. § 1307(c).  The Supreme Court found that the debtor could not convert his case to a

Chapter 13 because his concealment of assets would justify the court converting him back to a

Chapter 7 under Section 1307(c).  *Marrama*, 549 U.S. at 374-75.  The Supreme Court found the

debtor did not qualify under Chapter 13 and, therefore, did not meet the requirements of Section

706(d).  *Id.*

The Supreme Court explained that an honest but unfortunate debtor possesses an absolute

right to convert his case to a Chapter 13.  *Id.*  However, the Supreme Court clarified that bankruptcy

judges are granted broad authority to take necessary or appropriate action to prevent abuse of the

bankruptcy process.  *Id.*  The Supreme Court found that nothing in the texts or legislative histories

of Section 706(a) or 1307(c) "limits the authority of the court to take appropriate action in response

to fraudulent conduct by the atypical litigant who has demonstrated that he is not entitled to the

relief available to the typical debtor."  *Marrama*, 549 U.S. at 374-75.  The *Marrama* Court held

that a bad faith debtor forfeits his absolute right to convert from a Chapter 7 to a Chapter 13 under

Section 706(a).  *Id.*  The Supreme Court did not have reason to analyze the interplay of Sections

1307(b) and (c).

iii.   Post-*Marrama*

Following *Marrama*, most courts agreed that the right to voluntarily dismiss a Chapter 13

case was not absolute for bad-faith debtors.  *See In re Jacobsen*, 609 F.3d 647 (5th Cir. 2010);

*Rosson v. Fitzgerald (In re Rosson)*, 545 F.3d 764, 767 (9th Cir. 2008); *In re Kotche*, 457 B.R.

434 (D. Md. 2011); *In re Caola*, 422 B.R. 13 (Bankr. D.N.J. 2010); *but see e.g., In re Williams*,

435 B.R. 552, 560 (Bankr. N.D. Ill. 2010) (finding an absolute right to voluntary dismiss because

bankruptcy courts cannot use their equitable powers to prevent abuse of process if methods contradict other provisions of Bankruptcy Code).

A review of the post-*Marrama* landscape is instructive. In *In re Jacobsen*, the Fifth Circuit upheld a bankruptcy court's denial of the debtor's motion for voluntary dismissal and granted the trustee's motion to convert the case for bad faith. *In re Jacobsen*, 609 F.3d 647, 661-62 (5th Cir. 2010). The Fifth Circuit found the bankruptcy court was empowered by its equitable powers and the *Marrama* decision to prevent Section 1307(b) from being used as an "escape hatch" or other abuses of the bankruptcy process. *In re Jacobsen*, 609 F.3d at 661.

Similarly, in *In re Rosson*, the Ninth Circuit held that Section 1307(b) contained "an implied exception for bad faith conduct or abuse of the bankruptcy process" because *Marrama* established a universal principal that even unqualified rights "are subject to limitation by the bankruptcy court's power under [Section] 105(a)." *Rosson v. Fitzgerald (In re Rosson)*, 545 F.3d 764, 767; 773 n.12 (9th Cir. 2008) *overruled by In re Nichols*, 10 F.4th 956 (9th Cir. 2021).

In *In re Caola*, the Chapter 13 debtor failed to disclose that he transferred his one-half interest in his marital residence to his wife one year prior to filing his Chapter 13 petition. *In re Caola*, 422 B.R. 13, 14-15 (Bankr. D.N.J. 2010). The trustee objected to confirmation. *In re Caola*, 422 B.R. at 15. The debtor's attorney advised that the debtor would no longer pursue confirmation and would, instead, move to voluntarily dismiss the case. *Id*. at 15. The trustee objected and requested the case be converted to a Chapter 7. *Id*. The court held that "a debtor's right to dismiss is not absolute when there has been a showing of bad faith conduct." *Id*. at 20.

Finally, in *In re Kotche*, the district court held that a Chapter 13 debtor's right to voluntarily dismiss was not absolute, and that courts could deny a debtor's motion to dismiss based on a debtor's "bad faith." *In re Kotche*, 457 B.R. 434, 440 (D. Md. 2011). The court explained that

the bankruptcy laws were enacted for the "honest but unfortunate debtor." *In re Kotche*, 457 B.R. at 439-40 (quoting *Marrama* at 549 U.S. at 374). The *Kotche* court reasoned, a bankruptcy court's power under Section 105(a) permitted the court to deny dismissal to mitigate a debtor's bad faith and abuse of the bankruptcy process. *In re Kotche*, 457 B.R. at 439-40.

> iv.    *Law v. Siegel*

The Supreme Court clarified the scope of *Marrama* in *Law v. Siegel*. 571 U.S. at 426. The debtor in *Law v. Siegel* fraudulently claimed liens on his primary residence to protect his interest in the home. *Id*. at 418. The trustee filed a motion to "surcharge" the debtor's $75,000 homestead exemption based on the fraudulent misrepresentations. *Id*. at 419-20. The bankruptcy court granted the trustee's motion to "surcharge" the entirety of the debtor's homestead exemption finding the debtor perpetrated a lengthy and costly fraud on his creditors and the court. *Id*. at 420. Both the Ninth Circuit BAP and the Ninth Circuit affirmed the bankruptcy court's ruling. *Id*.

On appeal, the Supreme Court held the bankruptcy court was not authorized to grant the trustee's motion because it explicitly interfered with the debtor's statutory right to exempt $75,000 of equity from his home. *Law v. Siegel*, 571 U.S. at 422. The Supreme Court explained that Section 522 entitles a debtor to a homestead exemption or to any exemptions otherwise available under state law. *Law v. Siegel*, 571 U.S. at 418; *see* 11 U.S.C. §§ 522(b) and 522(d). Under California's homestead exemption, the debtor was entitled to exempt $75,000 of equity from his residence. *Law v. Siegel*, 571 U.S. at 415. The Supreme Court explained that Section 522 "does not give courts discretion to grant or withhold exemptions based on whatever considerations they deem appropriate." *Id*. at 423.

Discussing *Marrama*, the Supreme Court agreed that bankruptcy courts have "inherent power … to sanction 'abusive litigation practices,'" but clarified that those powers cannot be used

to take "action prohibited elsewhere in the [Bankruptcy] Code." *Law v. Siegel*, 571 U.S. at 421

(quoting *Marrama*, 549 U.S. at 375-75). The Supreme Court emphasized that a bankruptcy courts'

inherent powers to sanction abusive litigation practices are subordinate to statutory directives. *Law*

*v. Siegel*, 571 U.S. at 421. The Supreme Court stated:

> At most, *Marrama*'s dictum suggests that in some circumstances a
> bankruptcy court may be authorized to dispense with futile
> procedural niceties … to reach more expeditiously an end result
> required by the Code. *Marrama* most certainly did not endorse,
> even in dictum, the view that equitable considerations permit a
> bankruptcy court to contravene express provisions of the Code.

*Law v. Siegel*, 571 U.S. at 426.

The Supreme Court recognized that its decision might unfortunately create inequitable

outcomes for future trustees and creditors. *Id*. at 426. However, it reiterated that courts have

alternative methods to punish bad faith debtors. *Id*. at 427. Other methods exist for the bankruptcy

court to sanction the debtor even if a surcharge is unavailable. *Id*. at 427. Namely, the bankruptcy

court could deny the debtor's discharge under Section 727 and order the debtor to pay attorney's

fees or other monetary sanctions under Federal Rules of Bankruptcy Procedure Rule 9011. *Law*

*v. Siegel*, 571 U.S at 427.

    v.  The Landscape Post-*Law v. Siegel*

Three years after *Law v. Siegel*, the Third Circuit was presented with the issue of whether

a debtor has an absolute right to dismiss. *In re Ross*, 858 F.3d 781 (3d Cir. 2017). In *In re Ross*,

a creditor moved to dismiss the debtor's Chapter 13 case with prejudice, arguing that the debtor

filed the petition in bad faith. 858 F.3d at 782. In response, the debtor moved to voluntarily

dismiss the case. *Id.* The bankruptcy court dismissed the case with prejudice and issued a broad

filing injunction against the Debtor for abusing the bankruptcy system. *Id.* The district court

affirmed, finding the debtor had an absolute right to dismiss, and the bankruptcy court did not

abuse its discretion in issuing the filing injunction. *Id*. at 783; *see Ross v. AmeriChoice Federal Credit Union*, 530 B.R. 277, 293 (E.D. Pa. 2015).

On appeal, the Third Circuit discussed the case law addressing an absolute right to voluntary dismissal. *Id*. at 783-84. However, the Third Circuit ultimately decided the case on other grounds. *In re Ross*, 858 F.3d at 784. The Third Circuit focused its ruling on the bankruptcy court's authority to issue a filing injunction in the context of approving a debtor's Section 1307(b) voluntary dismissal. *Id*. Notably, the Third Circuit's ruling did not disrupt the debtor's voluntary right to dismiss, which the district court explicitly upheld after considering *Law v. Siegel*. *Ross v. AmeriChoice Federal Credit Union*, 530 B.R. at 288.

In 2021, the Ninth Circuit held that its prior ruling in *In re Rosson* was effectively overruled by *Law v. Siegel*. *In re Nichols*, 10 F.4th at 962. In *Nichols*, the Ninth Circuit reversed the Ninth Circuit BAP, which upheld the bankruptcy court's decision granting a creditors' motion to convert the debtor's Chapter 13 case to Chapter 7 and denying the debtor's motion to voluntarily dismiss. *Id*. at 959. Reversing its stance from its prior ruling in *In re Rosson*, the Ninth Circuit found the bankruptcy court erred by withholding the debtor's absolute right to voluntarily dismiss under Section 1307(b). *In re Nichols*, 10 F.4th at 959. The Ninth Circuit reasoned that *Law v. Siegel* rejected *Rosson* and other courts' sweeping interpretation of *Marrama*. *In re Nichols*, 10 F.4th at 962. According to *Rosson* and other courts, *Marrama* held that "[Section] 105(a) powers…implicitly qualify language contained elsewhere in the Bankruptcy Code." *In re Nichols*, 10 F.4th at 961. However, the Ninth Circuit ruled *Law v. Siegel* dispelled any notion that bankruptcy courts' equitable powers could modify the clear language in the Bankruptcy Code. *In re Nichols*, 10 F.4th at 961. The Ninth Circuit held that the bankruptcy court could not rely on its Section 105(a) powers to deny the debtor's motion to voluntarily dismiss regardless of a debtor's

bad faith conduct.  *Id.* at 964.  In other words, the Ninth Circuit held a Chapter 13 debtor has an absolute right to dismiss under Section 1307(b).

In 2021, the Sixth Circuit analyzed whether a Chapter 13 debtor's right to voluntarily dismiss is absolute.  *In re Smith*, 999 F.3d at 452.  On three separate occasions, the debtor in *Smith* filed Chapter 13 petitions days before the foreclosure sale for his home.  *Id*. at 455.  In each instance, the debtor then moved to voluntarily dismiss the case under Section 1307(b).  *In re Smith*, 999 F.3d at 455.  Roughly four months after the debtor successfully dismissed his third case, a creditor moved to vacate the dismissal order.  *Id*. at 454-55.  The bankruptcy court granted the creditor's motion and lifted the automatic stay in the debtor's case for two years.  *Id*. at 455.  The debtor appealed.  *Id*.  The district court denied the motion but certified an interlocutory appeal on the issue of whether the debtor's case could be reinstated.  *Id*.  The Sixth Circuit found the district court abused its discretion by permitting the bankruptcy court to reinstate the debtor's Chapter 13 case.  *Id*. at 456.  Citing the plain language of Section 1307(b) and the voluntary nature of Chapter 13, the Sixth Circuit held that Section 1307(b) mandated dismissal of the debtor's case.  *In re Smith*, 999 F.3d at 455.  The Sixth Circuit cited to *Law v. Siegel* for the premise that the bankruptcy courts' Section 105(a) equitable powers "are interstitial, meaning they must and can only be exercised within the confines of the Bankruptcy Code."  *In re Smith*, 999 F.3d at 456 (citing *Law v. Siegel*, 571 U.S. at 421).  The Sixth Circuit also explained that the bankruptcy court never utilized its Section 105(a) powers to alternatively sanction the debtor's bad faith filings, nor did the creditor move for relief from the automatic stay.  *In re Smith*, 999 F.3d at 454.

Since the Supreme Court's decision in *Law v. Siegel*, no circuit court has found an implied equitable exception to Section 1307(b).  The majority trend after *Law v. Siegel* is that Chapter 13 debtors possess an absolute right to dismiss.  *See e.g., In re Minogue*, 632 B.R. 287, 293 (Bankr.

D. S.C. 2021) (based on "the clear instruction of *Law v. Siegel* and its consideration of *Marrama*," the court found no reason to conclude that it could prevent the Chapter 13 debtor from voluntarily dismissing the case); *In re Cenk*, 612 B.R. 323, 328-329 (Bankr. W.D. Pa. 2020) (raising concerns about the implications of granting a dismissal, but ultimately finding that evolution of case law and plain language of Section 1307(b) mandate granting dismissal); *In re Marinari*, 610 B.R. at 93 (debtor's absolute right to dismiss under Section 1307(b) does not create inequity or permit abuse of the bankruptcy process because creditors and courts may use other avenues to address bad faith); *In re Fisher*, No. 14-61076, 2015 WL 1263354, at *3 (Bankr. W.D. Va. Mar. 19, 2015) (Section 1307(b) is patently clear that an eligible debtor has an absolute right to voluntarily dismiss, and Section 1307(b) is not limited in the way that Section 706(d) limited Section 1307(c) in *Marrama*); *but see e.g., In re Pino*, Case No. 09–14063–BFK, 2014 WL 1910078 (Bankr. E.D. Va. May 13, 2014) (denying the debtor's motion to voluntarily dismiss and instead granting trustee's motion to dismiss with prejudice, finding court had power to sanction debtor's bad-faith conduct).

### 2. **Section 1307(b) and *Law v. Siegel* Require this Court to Grant the Debtor's Request for Voluntary Dismissal**

As the Third Circuit has not directly addressed the issue before the Court, the Court first looks to the text of Section 1307(b). *See United States v. Hodge*, 948 F.3d 160, 162 (3d Cir. 2020); *see also United States v. Introcaso*, 506 F.3d 260, 264 (3d Cir. 2007). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *United States v. Jackson*, 964 F.3d 197, 201 (3d Cir. 2020) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)). "If the language of a statute is clear [,] the text of the statute is the end of the matter. If the language is unclear, we attempt to discern Congress' intent using the canons of

statutory construction." *United States v. Introcaso*, 506 F.3d at 264–65 (3d Cir. 2007) (quoting

*United States v. Jones,* 471 F.3d 478, 480 (3d Cir. 2006)).

Section 1307(b) provides:

> On request of the debtor at any time, if the case has not been converted under section 706, 1112, or 1208 of this title, the court *shall* dismiss a case under this chapter. Any waiver of the right to dismiss under this section is unenforceable.

11 U.S.C. § 1307(b) (emphasis added).

Despite Creditor Kim's assertions, no ambiguity exists in the text of Section 1307(b).  The

employ of the term "shall" is instructive, as "shall" is "generally mandatory when used in a

statute."  *Shenango Inc. v. Apfel*, 307 F.3d 174, 193 (3d Cir. 2002).  The word "shall" "normally

creates an obligation impervious to judicial discretion."  *In re FTX Trading Ltd.*, 91 F.4th 148, 153

(3d Cir. 2024) (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35

(1998)).  Section 1307(b) states that "the court *shall* dismiss" a previously unconverted case upon

a debtor's request.  11 U.S.C. § 1307(b) (emphasis added).  The statute leaves no discretion to the

court.  Further, *Law v. Siegel* dictates that courts cannot utilize discretion if it contradicts the

express language of the Bankruptcy Code.  *See Law v. Siegel*, 571 U.S. at 421.  The only limitation

imposed in Section 1307(b) is that the case has not been previously converted.  *See* 11 U.S.C. §

1307(b).  Therefore, the mandate under Section 1307(b) is clear.

Here, the Debtor moved to voluntarily dismiss his case at the Confirmation Hearing.  The

Debtor's case never previously converted.  Creditor Kim asserts that an absolute right of dismissal

creates an "escape hatch" for bad debtors.  ECF No. 29.  These concerns are understandable.

However, the Bankruptcy Code leaves no room for discretion.  The Debtor's alleged bad faith does

not negate the clear directives contained in Section 1307(b).  Bad-faith circumstances do not

empower bankruptcy courts to rewrite the Bankruptcy Code.  *Law v. Siegel*, 571 U.S. at 427-28.

Courts may exercise their equitable powers "within the confines of the Bankruptcy Code" to sanction bad faith conduct. *Id*. at 421 (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) (internal quotations omitted). Nothing in Section 1307 indicates that courts can resort to subsection (c) to avoid granting a debtor's dismissal under subsection (b), regardless of whether the debtor is found to have acted in bad faith. The Supreme Court tells us courts must find other means for preventing and mitigating abuses of the bankruptcy process.

Based on the foregoing, the Court finds that the Debtor's right to voluntarily dismiss his case is absolute under Section 1307(b). However, because the Creditor alleged bad faith, the Court's inquiry is not complete. Even though the Debtor possesses an absolute right to dismiss, the Court may still issue other orders necessary to prevent abuse of the bankruptcy process.

## B.  THE DEBTOR FILED THIS CASE IN BAD FAITH

### 1.  <u>Section 105(a) and this Court's Inherent Authority Permit it to Sanction the Debtor for Bad Faith</u>

"The Supreme Court has long recognized federal courts' inherent power to protect the integrity of their proceedings." *Sofaly v. Portfolio Recovery Assocs., LLC*, No. 24-2639, 2025 WL 2691992, at *3 (3d Cir. Sept. 22, 2025) (citing *United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32, 34 (1812)). Section 105 permits the Court to issue sanctions that help to effectuate the Bankruptcy Code and to prevent abuse of the bankruptcy system. *See* 11 U.S.C. § 105(a). When a Chapter 13 debtor files for bankruptcy, he accesses a safe harbor in which he can remain to reorganize his debts. *In re Napier-Lopez*, No. 23-10694-ABA, 2023 WL 3260150, at *1 (Bankr. D.N.J. May 4, 2023). However, the ability to remain in this safe harbor is not an unfettered one. *Id.* Once a debtor files for bankruptcy, he is subject to the requirements of the Bankruptcy Code.

Section 105(a) gives bankruptcy courts the statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.

11 U.S.C. § 105(a). Further, bankruptcy courts "may also possess 'inherent power … to sanction 'abusive litigation practices.'" *Law. v. Siegel*, at 421; *see, e.g., Law v. Siegel*, 571 U.S. at 427 (noting that bankruptcy courts have the "essential authority to respond to debtor misconduct with meaningful sanctions"); *Fellheimer, Eichen & Braverman, P.C. v. Charter Tech., Inc.*, 57 F.3d 1215, 1224 (3d Cir. 1995) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) ("The imposition of sanctions ... transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself ...."). This Court cannot deny the Debtor his absolute right to voluntary dismissal. It may, however, use its Section 105(a) powers and inherent authority to sanction the Debtor in a manner that does not contravene the Bankruptcy Code if the Debtor acted in bad faith. The determination of bad faith is "a fact intensive determination." *In re Lilley,* 91 F.3d 491, 496 (3d Cir. 1996). Courts must look to the totality of the circumstances to determine bad faith. *In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007). Courts should consider a variety of factors including:

> [T]he nature of the debt ...; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.

*In re Myers*, 491 F.3d at 125 (quoting *In re Lilley,* 91 F.3d 491, 496 (3d Cir. 1996)); *see e.g., In re King*, 143 B.R. 75, 79 (Bankr. D.N.J. 2022) (quoting *In re Myers*, 491 F.3d at 125) (filing bankruptcy while related state court litigation is pending is not bad faith per se but can be when "the purpose of the filing is to defeat state court litigation without a reorganization purpose"); *In re Reaves,* No. 23-12045 (JNP), 2023 WL 3193247, at *1 (Bankr. D.N.J. Apr. 28, 2023) (court imposed two-year filing bar due to the debtor's fifteen prior bankruptcy cases and repeated failure to comply with the Code); *In re Guevara,* No. 04-30556DWS, 2004 WL 2495410, at *1 (Bankr. E.D. Pa. Oct. 21, 2004) (imposing a 180-day bar when the debtor filed his fourth Chapter 13 case

to stay sheriff's sale); *In re Thompson*, 557 B.R. 856, 857 (Bankr. W.D. Pa. 2016) (imposing a
180-day bar because the debtor was a serial filer who consistently failed to comply with basic
requirements of the Bankruptcy Code); *see generally In re Ross*, 858 F.3d at 786 (3d Cir. 2017)
(Third Circuit commented that 180-day bar should not be imposed because the debtor appeared
before the Bankruptcy Court and followed the court's orders). Courts may also consider "whether
debtors misrepresented facts in the petition or plan, unfairly manipulated the Bankruptcy Code, or
otherwise filed the chapter 13 petition or plan in an inequitable manner." *In re Chuan Min Chang*,
Case No. NC-20-1274-BSG, 2021 WL 2283915 at *4 (9th Cir. BAP June 3, 2021) (citing *In re
Leavitt*, 171 F.3d 1219, 1224 (9th Cir. 1999)).

In *In re Napier-Lopez*, the court imposed a 180-day bar on the debtor's future filings. No.
23-10694-ABA, 2023 WL 3260150, at *17. The court justified the bar because it found that the
debtor had no regard for her duties and responsibilities as a debtor, was evasive in her filings, and
provided contradictory statements. *Id.* In issuing the 180-day bar, the court noted that the debtor
wrongly believed she could pick and choose how to run her Chapter 13 case, without regard to the
Bankruptcy Code's requirements. *Id.* at *16.

In *In re Vascular Access Centers, L.P.*, the court found that monetary sanctions under
Section 105(a) were warranted against the sole member of the debtor company. 646 B.R. 735, 755
(Bankr. E.D. Pa. 2022). The court reasoned sanctions were warranted because the sole member
commenced a bankruptcy case for the company only to prevent derivative litigation against himself
from proceeding to trial. *In re Vascular Access Centers, L.P.*, 646 B.R. at 755.

The Ninth Circuit BAP affirmed a bankruptcy court's finding of a bad faith filing against
Chapter 13 joint debtors because they transferred property and concealed assets prepetition. *In re
Chuan Min Chang*, 2021 WL 2283915 at *1. In *Chuan Min Chang*, the joint debtors sold a home

to two individuals who later discovered over $100,000 in defects to the home. *In re Chuan Min Chang*, 2021 WL 2283915 at *1. The two individuals filed suit against the joint debtors in state court, where they were awarded damages. *Id.* The debtors filed for bankruptcy less than two hours after the state court judgment was handed down. *Id.* The bankruptcy court discovered that one of the debtors transferred 100% of her interest in a rental home to her daughter, who transferred the interest back to the debtor for no consideration. *Id.* The transfers occurred pre-petition while the state court litigation was pending. *Id.* Even though the property was transferred back to the joint debtor prepetition, the joint debtor failed to voluntarily disclose the transfers. *Id.* at *5. Further, the joint debtor only unwound the transfers after they were discovered, and a fraudulent conveyance suit was filed. *Id.* Accordingly, the BAP agreed with the bankruptcy court's finding of a bad faith filing. *Id.*

Courts cannot impose a filing bar that is "arbitrary or irrational." *In re Ross*, 858 F.3d at 784 (quoting *United States v. Bailey*, 840 F.3d 99, 117 (3d Cir. 2016)). A filing injunction that exceeds 180 days is proper when debtors abuse the bankruptcy system. *See In re Oliver*, 323 B.R. 769, 775 (Bankr. M.D. Ala. 2005) (imposing a two-year bar on refiling when the debtor filed a bankruptcy petition, in violation of an injunction entered when a prior case was dismissed, to stop a creditor from foreclosing on his residence); *see In re Stathatos*, 163 B.R. 83, 88 (N.D. Tex. 1993) (imposing two-year refiling bar and dismissing Debtor's fourth bankruptcy case with prejudice when the debtor filed his petitions to hinder eviction proceedings).

## 2.  The Debtor Filed for Bankruptcy in Bad Faith

This Court finds the Debtor is a highly educated and well-spoken individual. But, the Court finds the Debtor is not credible and filed his Chapter 13 case in bad faith. The Debtor participated in pre-petition transactions that transferred assets that would have been available in his bankruptcy

case. The Debtor's Petition and Schedules are woefully deficient in disclosing all assets, liabilities, and various other items required. The Debtor's testimony was purposefully evasive and confusing, and—at times—untruthful.

      i.   Pre-Petition

At the April 28, 2025 Hearing, the Debtor acknowledged the existence of a Certificate of Incorporation for JS Global Enterprise Inc. (the "**Incorporation Certificate**"). *See* Evid. Hrg. Tr. 17:9–18:6, April 28, 2025. In the Incorporation Certificate, the Debtor listed: (1) himself as the registered agent; (2) himself and his brother as directors; and (3) Sushi Café's address as the main business address for JS Global Enterprise Inc. *See Id*. Debtor testified JS Global Enterprise Inc. is the same company as JS Global, Inc.

On August 25, 2022, Creditor Kim commenced the District Court Case against the Debtor. ECF No. 20-2, ¶ 4. The Debtor testified that he closed Sushi Café that same month. The following month, the Debtor amended the Incorporation Certificate (the "**Incorporation Amendment**"). *See* Evid. Hrg. Tr. 18:11-17, April 28, 2025. In the Incorporation Amendment, the Debtor replaced himself with his brother as the registered agent and replaced himself with his wife as an officer and director. *Id*. at 21:18-24:8. Clearly, the Debtor made these changes to obfuscate his interests in JS Global Enterprise Inc.

In October of 2022, the Debtor's wife registered Kame Sushi. ECF No. 20-5. Despite Sushi Café's closing, the Debtor did not amend the main business address for JS Global Enterprise Inc. in the Incorporation Amendment, electing to keep the address where Kame Sushi operates. The Debtor testified that when he closed Sushi Café, he disposed of some of the business' equipment and left the rest of it at the same address where Kame Sushi currently operates. Not surprisingly, the Debtor received no payment for that equipment.

Shortly after closing Sushi Café, the Debtor admitted he transferred roughly $100,000 out of Sushi Café's bank account and invested it in Fresh Grab and Go, which the Debtor testified is incorporated as JS Global, Inc.  The Debtor only operated Fresh Grab and Go for approximately one month.  At that point, he asserts the $100,000 was gone—having used the money for operations.  So, in November 2022, the Debtor sold Fresh Grab and Go to someone named Will Park for a mere $1,000.  The Debtor further testified that he did not file his tax returns for the following two years, 2023 and 2024.

Together, these acts appear to be a concerted effort by the Debtor to conceal his financial status and transfer his assets and liabilities away from himself.  The only conceivable purpose for these acts was to prevent Creditor Kim, and any other creditor, from reaching the Debtor's assets. Meanwhile, it is inconceivable that someone with as much business acumen as the Debtor simply "got rid of" his business records.  ECF No. 20-5.  It is also hard to believe that the Debtor's operations for Fresh Grab and Go ran through $100,000 in less than a month—especially when it was a takeaway sushi setup only worth $1000 on sale. Yet, through it all, the Debtor still managed to pay the SBA Loan (which he personally guaranteed) through his undisclosed M&T Bank account.  The Debtor's pre-petition acts are a roadmap leading to a bad faith filing.

ii.  <u>Purpose of the Chapter 13 Filing</u>

The Debtor insists he had legitimate reasons for filing.  Evidently, that was nothing more than lip service.  While the Debtor states that he filed this Chapter 13 case because he lacked money for litigation costs in the District Court Case, this Court remains unconvinced.  Nothing about this Debtor's case leads this Court to believe he had a legitimate purpose in mind.  Further, the issues surrounding the District Court Case do not simply disappear because the Debtor filed bankruptcy.  Yes—that case was stayed.  However, the Debtor still had to resolve Creditor Kim's

claim, which would either be through a contested proceeding or resolution. This Court observed the latter is unlikely.

  iii. <u>The Petition and SOFA</u>

  The Debtor's Petition further underscores his bad faith. The Petition exhibits ambiguity, a failure to disclose, contradictions, and concealment. Yet, the Debtor signed under penalty of perjury. The Debtor failed to list the transfer/sale of Fresh Grab and Go to Will Park on his Petition. *See* ECF No. 1 at 42. The Debtor testified that he did not operate any business during 2023. But, he listed $13,613.00 in income in 2023 from "operating a business." *See* ECF No. 1 at 37. In the Petition, the Debtor failed to include the family members who supposedly lent him money as creditors or disclose how much money was lent to him. *See* ECF No. at 21-25; 37. The Debtor testified that he made his Chapter 13 plan payments from his M&T Bank account, but failed to list any bank accounts on the Petition. *See* ECF No. 1 at 12. The Debtor inconsistently listed his monthly income as $650 on *Schedule I* and $0.00 on his *Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period*, even though the Debtor signed the forms on the same day. *See* ECF No. 1 at 28 and 51. The Debtor testified at his 341(a) Meeting that he pays $2,500 in monthly rent payments, but failed to disclose any rent on *Schedule J*. *See* ECF No. 1 at 30. The Debtor asserts that because of a language barrier, he did not understand the question at the 341(a) Meeting. But, as indicated, the Court does not find the Debtor to be credible regarding his understanding of the English language. In the Petition, the Debtor failed to originally disclose the address of Kame Sushi or how long his wife was employed there. *See* ECF No. 1 at 28. Although the Debtor later amended *Schedule I* to include the information regarding Kame Sushi, the Debtor failed to amend any of the other inconsistencies in the Petition. *See* ECF No. 12; ECF No. 14.

Throughout the Evidentiary Hearing, the Debtor contradicted his own testimony on several occasions.  On direct examination, the Debtor could not recall if he had filed his 2022 tax return, but admitted he did not file his 2023 or 2024 tax returns.  Evid. Hrg. Tr. 93:25-94:5, March 19, 2025. The Debtor did not consult with a certified public accountant for taxes in 2023. Evid. Hrg. Tr. 49:12-14, April 28, 2025. On cross-examination (by his own counsel because he was called as an adverse witness), the Debtor was asked if the amounts listed on the Petition for his 2022 and 2023 income could have been taken from his tax returns for those years.  The Debtor replied affirmatively. *Id.* at 47:8-13. When questioned about his Petition, the Debtor could not recall if he signed it. Evid. Hrg. 70:13–71:8, March 19, 2025. The Debtor testified he was unsure if a signed Petition even existed. *Id.* The Debtor further testified multiple times that he was unsure how certain information listed in his Petition was determined.  Despite his educational background, the Debtor testified that he did not understand some of the basic information on the Petition. *Id.* at 13:25-14:22. The Court questions why, if that was the case, did he not ask his attorney to explain.

Like the debtor in *In re Napier-Lopez*, this Debtor was evasive in his Petition, failed to make numerous disclosures, and at times testified the opposite of what he listed in the Petition. And, like the joint debtor in *Chuan Min Chang*, the Debtor failed to voluntarily and comprehensively disclose his prepetition transfers, which appear to be solely motivated by the Debtor's intention to hinder Creditor Kim's potential collection efforts.[6]  By willingly forgoing the opportunity to correct inconsistencies in the Petition, the Debtor failed to respect and comply with his duties and responsibilities as a debtor.  The Debtor's supposed lack of knowledge on or recollection of his case, the contents of his Petition, and his business operations demonstrates the

---

[6] The Court recognizes that Creditor Kim does not have a judgment against the Debtor.  However, the Court is aware that Creditor Kim asserted, among other things, an FLSA claim against that Debtor.  The Debtor admitted he no longer has any business records.  The Court concludes that the Debtor may have a difficult time overcoming his burden without any records to substantiate his position.

Debtor's carelessness and disregard for the bankruptcy process.  Just as in *Napier-Lopez*, the Debtor here believed he could pick and choose how to run his Chapter 13 case by cherry-picking the information he disclosed in his Petition.  And, just like in *Napier-Lopez*, there are consequences.

The Debtor's defiance, which he masquerades as ignorance, is clear evidence of bad faith. Countless inconsistencies and fabrications were pointed out to the Debtor at the Hearings.  The Debtor admitted he had no idea how some of the information was calculated or determined.  Yet, at no point did the Debtor ever seek to amend his Petition after the Hearings.  Based on the overwhelming evidence, the Court finds the Debtor filed in bad faith.  This Court may impose a filing bar because of the Debtor's bad faith.

### C. THE CREDITOR'S MOTION TO CONVERT IS DENIED BECAUSE SECTION 1307(b) REQUIRES DISMISSAL

While Creditor Kim may have good reasons for seeking conversion based on Debtor's bad faith, as indicated, this Court's mandate is clear.  The Debtor's absolute right to voluntarily dismiss under Section 1307(b) is superior to Creditor Kim's right to seek to convert the Debtor's case to a Chapter 7 under Section 1307(c).  *See In re Mills*, 539 B.R. 879, 887 (Bankr. D. Kan. 2015) (denying the creditor's motion to convert as moot, finding the debtor had an absolute right to voluntarily dismiss his case at any time).  Thus, this Court cannot force the Debtor into a Chapter 7 case when he has already sought dismissal.

The Court is not persuaded by Creditor Kim's assertion that the Court can dispose of the Motion to Dismiss simply by choosing to first adjudicate, grant the Motion to Convert, and ignore the Debtor's request to voluntarily dismiss. This Court cannot consider the Motion to Convert because Section 1307(b) requires the Chapter 13 case be dismissed.

## **<u>CONCLUSION</u>**

The Motion to Dismiss is granted.  Consequently, the Motion to Convert is denied.  The

Court will impose a two-year bar on filing against the Debtor based on the Court's finding of bad

faith.  The Court will enter an order consistent with this ruling.

**DATED: September 29, 2025**

Honorable Stacey L. Meisel
United States Bankruptcy Judge